THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ULIE A. BRADY *et al.* Plaintiffs in Error.

*Opinion filed February 16, 1916—Rehearing denied April 18, 1916.*

1. CRIMINAL LAW—*an indictment for confidence game need not describe the property obtained.* Under section 98 of the Criminal Code, defining the confidence game, and section 99 thereof, declaring that an indictment for that offense shall be sufficient which charges the offense in the language of the statute creating it, it is not necessary that an indictment which charges the obtaining of "property" by means and by use of the confidence game shall describe the kind or character of the property obtained.

2. SAME—*section 99 of Criminal ·Code, referring to sufficiency of indictment for confidence game, is not invalid.* Section 99 of the Criminal Code, which provides that an indictment for the confidence game shall be sufficient which describes the offense in the language of the statute creating it, is not unconstitutional, as depriving the accused of his right to know the nature and cause of the accusation. (*Morton* v. *People,* 47 Ill. 468, followed.)

3. SAME—*defense of former acquittal or conviction is not settled by comparison of indictments.* The defense of a former acquittal or conviction may be made under a plea of not guilty, and on the trial parol evidence is admissible to show the party accused and the particular offense, and the question of the identity of the offense is not determined merely by comparison of the indictments.

4. SAME—*conviction will not be set aside merely because the evidence is conflicting.* In a criminal case the questions of the weight of the evidence and the credibility of witnesses are for the jury, and their verdict will not be set aside by a court of review merely because the evidence is conflicting, provided it is not so insufficient as to indicate the verdict was the result of passion or prejudice on the part of the jury.

CARTWRIGHT, DUNN and COOKE, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Jasper county; the Hon. J. C. McBRIDE, Judge, presiding.

ANDREWS & REAL, WHITAKER, WARD & PUGH, and J. L. WALDEN, for plaintiffs in error.

P. J. LUCEY, Attorney General, CHARLES D. FITHIAN, State's Attorney, and EUGENE P. MORRIS, (FRANCIS E. HINCKLEY, of counsel,) for the People.

272 – 26

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

The plaintiffs in error, Ulie A. Brady, Ernest Blanchard, George Meriwether and Charles Wilson, were indicted in the circuit court of Jasper county for the confidence game. The first count charged that the defendants obtained from Douglas Flake his money and property by means of the confidence game; the second count charged them with obtaining from Douglas Flake his property by means of the confidence game; and the third count charged them with obtaining, by means and by use of the confidence game, property of Douglas Flake. The court overruled a motion to quash the indictment and the defendants were tried. At the trial there was no evidence that the defendants obtained any money but there was testimony that they obtained from Douglas Flake a stock of goods. The jury returned a verdict finding them guilty, and the court, after overruling a motion for a new trial and a motion in arrest of judgment, sentenced them to confinement in the State penitentiary at Chester.

The first point raised by plaintiffs in error (hereafter called defendants) is that the indictment is not good and that their motion to quash it should have been sustained because the indictment does not describe the property alleged to have been obtained. Sections 98 and 99 of the Criminal Code, under which the indictment was returned by the grand jury, are as follows:

"Sec. 98. Every person who shall obtain, or attempt to obtain, from any other person or persons, any money or property, by means or by use of any false or bogus checks, or by any other means, instrument or device, commonly called the confidence game, shall be imprisoned in the penitentiary not less than one year nor more than ten years.

"Sec. 99. In every indictment under the preceding section, it shall be deemed and held a sufficient description of

the offense, to charge that the accused did, on, etc., unlaw-
fully and feloniously obtain, or attempt to obtain, (as the
case may be,) from A B (here insert the name of the per-
son defrauded or attempted to be defrauded,) his money
(or property, in case it be not money,) by means and by
use of the confidence game."

Those sections were adopted by the legislature in 1867
and their construction came before this court in 1868, in
the case of *Morton* v. *People,* 47 Ill. 468. In that case the
first count charged defendant with obtaining $30 in money,
and the second with obtaining a United States legal tender
treasury note for $10, one bank note for the payment of
$10 and two bank notes for the payment of $5 each, by
means of the confidence game. Neither count described or
set out the acts by which the money was obtained, and it
was urged the indictment was bad because it did not set
out the elements constituting the crime, and that section 99
violated section 9 of article 13 of the constitution of 1848,
which is substantially the same in our present constitution,
and which gives the accused the right to demand the nature
and cause of the accusation against him. The contentions
of defendant as stated by the court were: "The accused
cannot know from this indictment the exact charge against
him and the outer lines within which the evidence must
be confined, and cannot know what evidence he will be re-
quired to meet; nor could a conviction under this indict-
ment be pleadable in bar of another indictment for the
same offense; nor can the court see in it that a legally
defined crime has been committed. They insist that the
term 'confidence game' has no definition 'in law or litera-
ture,' and that 'no fifty men can be found who will define
alike the confidence game.' They further insist that the in-
dictment should specify all the facts with such certainty
that the offense may judicially appear to the court." In
discussing these questions the court quoted what was then
section 277 of the Criminal Code and in substantially the

same language as what is now paragraph 408 of the Crimi-
nal Code, (Hurd's Stat. 1913, p. 876,) that every indict-
ment shall be deemed sufficient which states the offense in
the language of the statute creating it or so plainly that the
nature of the offense may be easily understood by the jury,
and the court held the indictment was for a statutory of-
fense and was sufficient; that the offense was so set forth
that the accused could be at no loss to know what he was
charged with, so that he could prepare his defense, and that
the conviction under the indictment could be pleaded in bar
of another prosecution for the same offense. As to sec-
tion 99 being in violation of the constitution the court said:
"As to the constitutional objection, some of the cases re-
ferred to by the plaintiff in error may go to the extent
claimed, but as we have a very scrupulous regard for the
acts of a co-ordinate department of the government whose
exclusive duty it is to make laws, we cannot declare any
enactment of that department null and void as being against
the constitution unless we are fully convinced of the viola-
tion. We are not so convinced and therefore must uphold
the law." The construction placed upon paragraph 408 by
the court in that case has been approved in many cases not
involving the confidence game statute, but where said para-
graph was involved, to sustain an indictment charging a
statutory crime. *Lyons* v. *People,* 68 Ill. 271; *McCutch-
eon* v. *People,* 69 id. 601; *Loehr* v. *People,* 132 id. 504;
*West* v. *People,* 137 id. 189; *Honselman* v. *People,* 168 id.
172; *Cochran* v. *People,* 175 id. 28; *White* v. *People,* 179
id. 356; *People* v. *Covitz,* 262 id. 514.

Upon the question of the sufficiency of an indictment
in a confidence game case which did not set out the ele-
ments or acts constituting the crime, the *Morton case* has
been followed and expressly approved in *Maxwell* v. *Peo-
ple,* 158 Ill. 248, *Graham* v. *People,* 181 id. 477, *DuBois* v.
*People,* 200 id. 157, *Hughes* v. *People,* 223 id. 417, *People*
v. *Weil,* 243 id. 208, and *People* v. *Clark,* 256 id. 14. In

all but one of those cases the defendants were charged with obtaining money. In one of them the charge was for obtaining a check. In some of the indictments or counts in those cases the money was not described nor the amount stated, but whether it was necessary, in an indictment for obtaining money by means of the confidence game, to describe the money or state the amount of it does not appear to have been raised, or at least it was never directly passed upon until the decision in *People* v. *Clark, supra.* In that case the indictment charged the defendant with obtaining money by means of the confidence game but contained no description of the money and did not state the amount. The defendant in this court contended that if section 99 be held to authorize an indictment in the form therein prescribed it violated defendant's constitutional right to demand the nature and cause of the accusation. The court followed and adhered to the *Morton case* and subsequent cases as to the sufficiency of an indictment for the confidence game which did not set out the acts employed by defendant, but said in those cases the question whether the legislature could declare an indictment sufficient which charged the obtaining of money, without words of description, by such criminal means as embezzlement, larceny and confidence game, was not involved. It was held the offense created by section 98 was complete by obtaining, by means of the confidence game, money, without regard to the amount or description.

The indictment here involved presents the question whether a charge in an indictment for obtaining property by means of the confidence game, without describing the property, is good. Section 98 creates and defines the crime of the confidence game, which, in substance, is the obtaining or attempting to obtain from another any money or property by means or by use of any false or bogus checks, "or by any other means, instrument or device, commonly called the confidence game." Section 6 of division 11,

which is paragraph 408 of the Criminal Code in Hurd's Statutes, provides that every indictment shall be sufficient which states the offense in the terms and language of the statute creating the offense, or so plainly that the nature of it may be understood by the jury. Section 99 provides that an indictment for the confidence game shall be sufficient which charges the obtaining or attempting to obtain from a person named, his money, or property in case it be not money, by means and by use of the confidence game. Section 98 does not define the acts that may constitute the confidence game, and section 99 declares that an indictment for that crime shall be sufficient which charges the offense in the language of the statute creating it. When the first judgment of conviction under the confidence game statute was before this court for review, it was urged that section 99 deprived the accused of his constitutional right to demand the nature and cause of the accusation and was therefore invalid, and that an indictment which failed to set out the elements or acts constituting the crime was not sufficient. As we have before stated, that contention was overruled, and the decision then made upon that question has been adhered to ever since.

We are unable to see why, if the legislature has power to declare an indictment good which simply charges the accused with obtaining money or property by means of the confidence game, without describing or setting out the acts, it may not also lawfully declare an indictment good which charges the obtaining of property without describing the property. It is difficult to understand why, if the former violates no constitutional right of the accused, the latter does, and we have held in an unbroken line of decisions, in declaring an indictment sufficient which does not set out or describe the acts of the accused, that section 99 is valid. In the *Clark case* we held that under the confidence game statute it is not necessary, where the charge is for obtaining money, that it be described or its value alleged in the

indictment. Why, then, is it necessary, when the charge is obtaining property, that it should be described? There are various kinds of money as well as various kinds of property. The crime does not consist in obtaining any particular kind of either money or property. It consists in obtaining money or property, without reference to its kind or value. The *Clark case,* as well as a great many other cases before cited, recognized the rule that an indictment is good which charges a statutory offense in the language of the statute creating it, subject to the qualification that the indictment must, by statutory description or other apt averment, so identify the offense as to meet the constitutional requirement, and it was there said: "While a statute can not dispense with a statement in the indictment of the essential elements of the crime charged against an accused person, still the legislature may provide that the property which is the subject of the crime may be described by words of general description." That is precisely what the statute has done in cases of obtaining property by means of the confidence game. Section 98 states what is necessary to constitute the offense, and where that is so, an indictment charging the offense in the language of the statute is sufficient.

Viewed from a practical standpoint it appears to us that there is no valid reason for holding this indictment bad. We would certainly not sustain it if it violated, or if we understood it violated, any constitutional provision or right of the accused. We recognize it to be our duty to give full effect to all the constitutional and other rights of a defendant in a criminal case, but we also recognize it as our duty to sustain all legislative enactments unless satisfied, beyond a reasonable doubt, that they violate the fundamental law. (*People* v. *McBride,* 234 Ill. 146, and cases there cited.) The indictment here charges the accused obtained "the property" of Douglas Flake by means of the confidence game. That informed them "of the nature and

cause of the accusation" and was sufficient. A bill of particulars will not aid a bad indictment, and by the decisions of this court one is not required to be given under an indictment charging the confidence game in the language of the statute, either to enable the accused to know what he is charged with or that he may plead the judgment in bar of another prosecution for the same offense. (*DuBois* v. *People, supra; People* v. *Weil, supra.*) In some cases, however, courts, in their discretion, have at the request of the defendants required a bill of particulars to be furnished. That was done in this case. The bill of particulars is not preserved in the record and no complaint is made of it. It will be presumed that it furnished more specifically a description of the acts of the accused and of the property alleged to have been obtained. It is, it appears to us, inconceivable that under such a charge the accused would not know what property of Flake they were charged with obtaining by means of the confidence game. In the very nature of things they knew of the transaction between them and Flake and the property obtained in the transaction. The crime did not depend upon the description or value of the property, but upon whether the accused obtained any property of Flake by means of the confidence game. This record shows they were not surprised or their proper defense interfered with, or that they were in any way injured because the property they were charged with obtaining was not described. There was but one transaction between the parties, and that was obtaining the stock of goods. Flake never met any of the parties, except Meriwether, before he met them in this transaction. Defendants were in no way prejudiced because the indictment did not aver the property was a stock of goods. Of course, it can be imagined that because there is real property and several kinds of personal property a defendant might not know which kind of property he was charged with obtaining, but it is hardly imaginable that when the person from whom he was charged

with obtaining it is named, he would not know the kind or character of the property. Legislative acts should not be held invalid upon any such supposititious theory. In *Cannady* v. *People,* 17 Ill. 158, the indictment was for selling liquor without a license, and it was contended the indictment was insufficient because it failed to allege the name of the purchaser or that he was unknown. The contention was overruled, and in discussing it the court said: "These great niceties and strictness in pleading should only be countenanced and supported when it is apparent that the defendant may be surprised on the trial or unable to meet the charge or make preparation for his defense for want of greater certainty or particularity in the charge. Beyond this it tends more to the evasion than the investigation of the charge, and becomes rather a means of escaping punishment for crime than of defense against the accusation." This language has been expressly approved in a number of subsequent cases. The object of the constitutional provision referred to is notice to the accused, and when the statute so individuates the offense that an indictment in its language is notice to the defendant of the nature and cause of the charge and what he is really to be tried for, it is sufficient. *Cochran* v. *People, supra.*

It is further contended the nature and cause of the accusation are not sufficiently stated in the indictment so as to enable the defendants to plead the judgment in bar of a subsequent prosecution for the same offense. Under the present practice, whether the indictment is for the same offense as that charged in a former indictment under which there has been a final judgment is not determined by an inspection and comparison of the indictments, under a plea setting up the former judgment in bar. The defense of former acquittal or conviction may be made under the plea of not guilty, and on the trial the party accused and the particular offense may be shown by parol testimony. *Hankins* v. *People,* 106 Ill. 628; *Swalley* v. *People,* 116 id. 247;

*Bartell* v. *United States,* 227 U. S. 427; *Morton* v. *People, supra.*

Our conclusion upon this branch of the case is that the trial court did not err in overruling the motions to quash and in arrest.

It is also urged that the evidence is insufficient to sustain the verdict and judgment. The testimony is too voluminous to set out in full, and brief reference will be made only to the most material parts of it.

Douglas Flake testified he owned a stock of goods at Hidalgo, in Jasper county, Illinois, which he had recently traded for. He desired to sell it and had some correspondence with defendant Meriwether, whom he knew. On November 25, 1912, defendants Meriwether, Blanchard and Brady called at Flake's store, in Hidalgo. Meriwether introduced Blanchard and Brady, both of whom resided in Decatur. They told Flake they had come to buy his stock of goods. Flake priced the stock at $4500 without an invoice, or eighty cents on the dollar of what it would invoice. After some talk they agreed on $4000 as the purchase price. Blanchard and Brady said they had recently bought a stock of goods and were short of money. They proposed to trade property for the goods, but Flake refused to consider that proposition, as he wanted cash. They then proposed to give Flake their notes, which Flake said he would take if they were good, and that he would give them time if they would give him bankable notes. Brady said he owned 240 acres of land cornering with the corporate limits of Decatur, which was clear, and that he owned other property in Toledo, Charleston and Decatur, and said he was born and raised in Stewardson, Illinois, and formerly was in business there. He produced a recommendation signed by defendant Charles Wilson, of Stewardson. Four notes were written up for $1000 each, due in three, six, nine and twelve months, drawing five per cent interest, and signed by Blanchard and Brady. A bill of sale for the stock of

goods was prepared but was not delivered. Flake was to go to Stewardson to investigate whether the notes were good, and if he found them good the bill of sale and stock of goods were to be delivered to the purchasers. Brady referred Flake to Wilson, and Flake said if he could get the cash for the notes the trade would be completed. That same night Flake and Meriwether left Hidalgo for Stewardson and Blanchard and Brady remained at Hidalgo. On arriving in Stewardson the next morning Flake and Meriwether saw Wilson between seven and eight o'clock in the back room of the bank Wilson was connected with, and Flake testified no one was present in the room but Wilson, Meriwether and himself. He showed the notes to Wilson and asked if they were good. Wilson said Brady was good for any amount he would contract for and that the notes were all right. Flake asked him if he would cash them, and he said he could not,—that money was close then. Flake said he wanted the money, and Wilson said he would cash them in twenty or thirty days at two per cent discount. Flake and Meriwether then left to return to Hidalgo. On their way Meriwether asked Flake if he could wire Blanchard and Brady, and said they had told him to do so if Flake found he could use the notes. Flake said that would be all right, and Meriwether wired the parties at Hidalgo. Flake and Meriwether arrived at Hidalgo that afternoon and found Blanchard and Brady had secured a car and loaded most of the stock for shipment to Mt. Auburn. Flake delivered them the bill of sale. In about twenty days, and again in about thirty days, Flake wrote Wilson but received no replies. Flake testified that in a week or so after he sold his stock of goods he went to Stewardson with Daniel Conners to see Wilson. Conners had a stock of hardware in Hidalgo, and Flake was talking to him about buying it and paying for it with the notes of Brady and Blanchard or some of them. Conners and Flake

went together to see Wilson, and Conners asked him if the
notes of Brady were good. Wilson said Brady was good
for any amount he contracted for; that he had a recom-
mendation from his bank, and that in a week or so he could
probably cash the notes but at that time was short of funds.
In July after the trade Flake again went to Stewardson to
see Wilson about the notes, and Wilson said "he would see
the boys and get the matter straightened up." That was
all witness could get out of him. · Flake made some effort
to collect the notes but was unable to do so. He traded
two of them for an 80-acre tract of land in Jasper county
which was subject to a mortgage of $2500. Flake further
testified he had a talk with Blanchard, Brady and Wilson
about the payment of the notes in the fall of 1914, in To-
ledo, Illinois. Blanchard said he did not have anything
and could not pay; that the other fellows got the money
for which the goods were sold; that he (Blanchard) was
simply used as a stool-pigeon. In his talk with Wilson he
(Wilson) said he would see the boys on the road home
that evening, talk the matter over with them and let Flake
know in a few days what they were going to do, but Flake
never heard from him.

A portion of a letter from Meriwether to Flake, dated
December 17, 1912, was introduced in evidence. It was in
reply to a letter written Meriwether by Flake, and from the
part admitted in evidence it appears Meriwether was pro-
posing to help Flake trade off the notes, for he says "this
man" is ready to investigate the notes as soon as he found
out that Flake would trade, "so you know we can get notes
recommended and he is ready to trade." Nothing came of
that proposition however.

There is no dispute that Brady, in the presence of
Blanchard and Meriwether, referred Flake to Wilson and
the bank with which he was connected, for information
whether the notes were good. There is a conflict as to
whether Brady produced a written statement signed by Wil-

son stating that Brady was good for any amount he might contract for. Flake testified he did produce a recommendation, but he was not permitted to testify to the contents of it, but Mrs. Flake testified that he produced a recommendation stating Brady was financially responsible for any contract that he might make, and Flake also testified that in one of his interviews with Wilson, Wilson said Brady had such a recommendation. Blanchard, Brady and Meriwether denied that such recommendation was produced and shown Flake while negotiations for the trade were going on, and Wilson and Meriwether denied Wilson told Flake, in the bank, Brady had such a recommendation. Roley and Yakey, who claimed to have heard the talk between Flake and Wilson in the bank and who detailed what was said, or the substance of it, make no mention of such statement by Wilson. Wilson denies telling Flake in the bank that Brady was good and that he would take the notes at two per cent discount in twenty or thirty days, but says he told him he knew Brady well, had done a good deal of business with him and that Brady had always met his obligations, but that the amount was large and he would have to investigate further, as he did not know the principal, Blanchard, but at that time money was close and he was not buying notes. Meriwether, Roley and Yakey testified to substantially the same thing.

Daniel Conners testified that in January, 1913, he was talking with Flake about trading for the notes and he and Flake went to Stewardson to see Wilson. They saw him and inquired whether the notes were good and whether he would recommend them. They were the Blanchard and Brady notes given Flake, and Wilson said they were good notes but that he could not take them up for a few days. Wilson denied making such statement, which was also testified to by Flake.

Robert Holler testified he traded 80 acres of land subject to a $2500 incumbrance to Flake for two of the notes;

that the day before he testified he talked with Blanchard about them, and Blanchard said Brady and Wilson got all he had and he could not pay the notes; that he had another conversation with Blanchard in the court room, and Blanchard said Wilson, the banker, was to take care of the notes and that he would see him; that Blanchard further said he was simply a stool-pigeon and that they got all he had. This was denied by Blanchard.

William A. Rogers, in rebuttal and by way of impeachment, testified that in January, 1913, he had a conversation with Wilson from Toledo, Illinois, over the telephone, in which he inquired of Wilson, at the Farmers' and Merchants' Bank in Stewardson, whether notes signed by Blanchard and Brady were good, and that Wilson said they were good, or gilt-edged, and he would pay cash for them. Wilson admitted having a conversation with Rogers about the financial responsibility of Blanchard and Brady but denied telling him their notes were gilt-edged. Defendants denied the Toledo conversation testified to by Flake.

We think the jury were entirely warranted in concluding from the testimony that the notes were worthless at the time they were given and that the parties who gave them then knew it. Blanchard testified that he did not claim he owned anything but a small stock of goods in Mt. Auburn. Brady testified that at the time the notes were given he owned real estate in Charleston, Villa Grove, Stewardson, Tuscola, Pana and Hunt, and that he owned some land in Johnson county, Illinois, 80 acres in Shelby county, and land in Tom Green county, Texas. He admitted much of it was incumbered and that the title to a considerable portion of it was not in him. At the time he testified he owned very little of it and did not claim to own much property. Blanchard, Brady and Meriwether admit Brady referred Flake to Wilson, at Stewardson, for information as to whether the notes signed by him were good. Flake refused to accept the notes without information that they were good

and went to Stewardson to see Wilson, to whom he had
been referred for information upon that subject. Flake's
testimony that Wilson said they were good and that he
would cash them in twenty or thirty days is denied by Wil-
son and by Meriwether, who Flake admits was present, and
by Roley and Yakey, who Flake says were not present at
the conversation when Wilson made that statement. Con-
ners corroborates Flake that at the time they together called
on Wilson when Conners was contemplating trading for the
notes, Wilson said they were good but that he could not
take them up for a few days. A circumstance to be con-
sidered in connection with all this conflicting evidence is,
that immediately after talking with Wilson, Flake decided
to accept the notes, turned the stock of goods over to the
purchasers and authorized Meriwether to so wire them. Or-
dinarily one manifesting the caution about taking the notes
that Flake manifested would not be expected to accept them
and give up his property without favorable information as
to their worth and value.

We cannot say that the jury were not warranted in con-
cluding, from the evidence, that a part of the scheme to get
the property for worthless notes was to induce Flake to see
Wilson, who would, and did, recommend the notes as good.
The importance, in connection with all the testimony, to be
attached to the fact that after talking with Wilson, Flake
accepted the notes signed by men he knew nothing about,
and who were, in fact, financially irresponsible, was a ques-
tion for consideration by the jury. Where the evidence is
so insufficient to sustain a verdict in a criminal case that
the verdict would seem to be the result of passion or preju-
dice it will not be approved by a reviewing court, but in
criminal cases the jury are the judges of the weight and
credibility of the testimony, and their verdict will not be
disturbed by a court of review because the evidence is con-
flicting. *Rogers* v. *People,* 98 Ill. 581; *Hanrahan* v. *Peo-
ple,* 91 id. 142; *People* v. *McCann,* 247 id. 130.

We have examined the criticisms of three instructions given on behalf of the People and are of opinion no error was committed by the court in that respect.

We are also of opinion there is no valid objection to the rulings of the court in the admission and rejection of evidence. Upon that question the rulings of the court, we think, were more favorable to the defendants than the law required. The court might well have admitted the testimony of Rogers as to a precisely similar transaction between himself and all the defendants except Meriwether, (*DuBois* v. *People, supra; People* v. *Weil, supra;*) but his testimony was ruled out upon objection of defendants.

We find nothing in this record that would appear to us to justify a reversal of the judgment, and it is affirmed.

*Judgment affirmed.*

CARTWRIGHT, DUNN and COOKE, JJ., dissenting:

In each count the defendants were charged with obtaining property from Douglas Flake without any designation of the kind or character of the property, or anything, except the name Douglas Flake, to distinguish the offense from obtaining, by means or by use of the confidence game, anything of any sort or description which could be the subject of property. Section 9 of the bill of rights provides that in all criminal prosecutions the accused shall have the right to demand the nature and cause of the accusation against him, and it has uniformly been held that in fulfillment of that guaranty every indictment must, either by a sufficient statutory description or other proper averments, so identify the particular offense as to notify the defendant of the crime laid to his charge. This indictment did not specify the particular offense charged, and would not have been sufficient, under the bill of rights, in an indictment for larceny, embezzlement, obtaining property by false pretenses or in the case of any other offense relating to property, or under the established rules of criminal pleading

at the common law. The argument for the sufficiency of the indictment rests upon section 99 of division 1 of the Criminal Code and section 6 of division 11 of that code. Section 99 declares that "it shall be deemed and held a sufficient description of the offense, to charge that the accused did, on, etc., unlawfully and feloniously obtain, or attempt to obtain, (as the case may be,) from A B (here insert the name of the person defrauded or attempted to be defrauded,) his money (or property, in case it be not money,) by means and by use of the confidence game." Section 6 of division 11 provides that it shall be sufficient to charge the defendant with a statutory offense in the terms and language of the statute describing the offense or so plainly that the nature of the offense may be easily understood by the jury.

The General Assembly may prescribe the form of an indictment on condition that the form prescribed meets the requirements of the constitution, and in this case the form prescribed uses the generic term "confidence game" as including the mode, manner and means by which confidence may be created and money or property obtained. The term includes all the various means, instruments or devices resorted to to secure the confidence of the one from whom money or property is obtained, and constituting, in the common understanding, the crime in question. The manifest purpose of the form prescribed is to obviate the necessity of specifying the particular act or acts that may be embraced within the general description of the confidence game, but the nature and cause of a criminal prosecution of which the accused must be informed by the indictment are not equivalent to the mode or manner or specific agency used to accomplish the result. A statement of the mode or manner of committing the crime, or the means employed, is not necessary to give the accused information as to the nature of the accusation which he is called upon to meet nor to identify the particular offense. Regarded as obviating the

272 – 27

necessity of specifying a particular means, instrument or device resorted to to secure confidence and obtain money or property, the form has been sustained in numerous cases and violates no constitutional provision. The conclusion reached by the majority in this case has resulted from a failure to distinguish between the accusation or crime and the mode, manner or means by which the crime is committed, and the distinction is clearly recognized by the courts.

A statute of Wisconsin provided as follows: "In indictments or informations for murder or manslaughter it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused, but it shall be sufficient in any indictment or information for murder to charge that the accused did willfully, feloniously and of his malice aforethought kill and murder the deceased, and in any indictment or information for manslaughter it shall be sufficient to charge that the accused did feloniously kill and slay the deceased." In the case of *Rowan* v. *State,* 30 Wis. 129, the court had under consideration the question whether an indictment in the form of the statute violated the provision of the bill of rights, and said that an information drawn under that statute plainly, substantially and formally described the crime of murder or manslaughter, and that when one is charged with murder he is fully informed of the nature and cause of the accusation against him without setting forth the manner in which or the means by which the crime was committed. The statute of Ohio was as follows: "In an indictment for manslaughter it shall not be necessary to set forth the manner in which or the means by which the death was caused, but it shall be sufficient to charge that the defendant did unlawfully kill and slay the deceased." In the case of *Wolf* v. *State,* 19 Ohio St. 248, it was held that the statute was not in conflict with the bill of rights, because the manner in which the crime was committed is apart from the nature and cause of the accusation. In

*Cathcart* v. *Commonwealth,* 37 Pa. St. 108, it was con-
tended that an indictment drawn under a similar statute
infringed upon the bill of rights. The court said that an
indictment must exhibit the nature and cause of the accu-
sation,—that is, it must set out the crime laid to the charge
of the accused,—but the mode in which the crime was com-
mitted is entirely apart from the nature and cause of the
accusation. The General Assembly may provide that where
one is accused of murder it shall not be necessary to state
whether he held the weapon in his right hand or left hand,
or what the weapon was, or whether the fatal blow was ad-
ministered upon the head or some other part of the body;
but that would be quite different from a provision that the
indictment need not state who was killed or otherwise iden-
tify the crime. It does not follow that because the General
Assembly may prescribe a form which charges the accused
with stealing, an indictment would be good which omit-
ted to state what property was stolen, or that an indict-
ment for arson would be sufficient under the bill of rights
which merely charged the accused with burning a dwelling
house or other building, or charged the crime of burglary
by breaking and entering a dwelling house or other build-
ing without identifying the building in some way.

The question now before the court has never been de-
cided, and could not have been for the reason that it was
never presented to the court in any form, since the indict-
ments in the various cases relied upon to sustain the indict-
ment in this case were for obtaining money, and that de-
scription of property is sufficient in any case. (*People* v.
*Clark,* 256 Ill. 14.) In the case of *Morton* v. *People,* 47
Ill. 468, where the question was whether the words "con-
fidence game" sufficiently defined the mode, manner and
means of obtaining property, the indictment charged in the
first count that the defendants obtained from one Daniel
Hughes $30 of his money, and in the second count that
they obtained certain legal tender notes and bank notes of

the values therein stated. In *Maxwell* v. *People,* 158 Ill. 248, the first count charged the defendants with obtaining from one Simon Rudesill $15 of his money, and the second count charged them with obtaining three United States legal tender treasury notes for the payment of $15. In *Graham* v. *People,* 181 Ill. 477, the first count charged the defendant with attempting to obtain from John A. Bowlin his money, and the second charged him with attempting to obtain $1500 good and lawful money of the United States. In *DuBois* v. *People,* 200 Ill. 157, the charge was for obtaining money. In *Hughes* v. *People,* 223 Ill. 417, the charge was for obtaining a check for $200, which was a good description. In *Juretich* v. *People,* 223 Ill. 484, there was a charge of obtaining money by means of the confidence game in the first count, and in the second obtaining money by false pretenses. In *People* v. *Weil,* 244 Ill. 176, the indictment was for obtaining money by means and by use of the confidence game.

In the case of *People* v. *Clark, supra,* the decision that a charge of obtaining money sufficiently designated the offense was based on three decisions in Massachusetts and Michigan, one of which was for the embezzlement of money to the amount, in value, of $25,000, the second for stealing a bank bill, and the third for larceny of money. None of them related to the confidence game or established a different rule for that offense than the requirement in a charge of larceny or embezzlement but decided that a description of property as money was specific. Of course, it would not be supposed that a charge of larceny or embezzlement of property other than money, without specifying the species of property, would be a compliance with the constitutional provision. Those decisions and the decision of this court were based on the doctrine that money was a species of property, and that the word "money" designated such property as a species from the generic term used in this case embracing every kind of property. The description,

of course, may be quite general, as in a case where the charge is stealing a watch, which is sufficient because definite, although the owner may have a number of watches, the description in such case giving the accused sufficient information of the crime laid to his charge. If uncertainty arises outside of the indictment it is to be removed by a bill of particulars, which is the proper office of such a bill.

As the question here involved was never before the court and could not by any possibility have been, no decision of the court is warrant for saying that the indictment in this case is good or ever would have been regarded as good. The objection in the cases cited was that there was no generally accepted definition of the words "confidence game," but it was held to be sufficient to describe the mode or means of obtaining money by a term popularized to the extent that it was well understood, and in *Maxwell* v. *People, supra,* the definition from Webster's International Dictionary was given. That definition was repeated in *DuBois* v. *People, supra,* and the definition of the Century Dictionary was added, and the opinions show that that was the only question before the court. It seems clear that the purpose of prescribing the form was to enable the charge to be made with reference to the means by which confidence was gained. That being the purpose, it cannot be said that it was the intention of the General Assembly, by inserting parenthetically the word "property" to indicate that the charge was to be for obtaining property rather than money, to disregard the constitution as to one particular offense and overturn every known rule of criminal pleading. It ought not to be assumed that the General Assembly intended to disregard the constitution, and it is not necessary to say that there was such an intention, since there is no provision that the offense need not be identified by any description of property obtained. If that was the intention it would not be effective, since the constitution is supreme.

The provision of section 6 relating to charging the defendant with a statutory offense in the terms and language of the statute or so plainly that the nature of the offense may easily be understood by the jury is subject, as has often been held, to the necessary qualification that it is not sufficient to charge the accused with some one of the same general class of offenses, but the indictment must specify the particular offense so that he may be apprised of the nature and cause of the accusation. Whether a charge in the language of the statute satisfies the constitution depends upon the manner in which the offense is defined in the statute, and if the statute is not sufficiently specific to give notice of the particular crime included in the class with which the accused is charged, a more particular statement is necessary. It is therefore never sufficient merely to copy a statute which uses nothing but the generic term of a class of offenses. (*Anthony* v. *State,* 29 Ala. 27; *State* v. *Jackson,* 39 Conn. 229; *State* v. *Higgins,* 53 Vt. 191; *Commonwealth* v. *Filburn,* 119 Mass. 297; *United States* v. *Cruikshank,* 92 U. S. 542; *United States* v. *Hess,* 124 id. 483; *Johnson* v. *People,* 113 Ill. 99.) In *McNair* v. *People,* 89 Ill. 441, the court said that the offense charged, whether in the language of the statute or so as to be easily understood by the jury, should so describe the offense that the judgment on the trial could be pleaded in bar of another prosecution, and that counts for printing an obscene pamphlet with intention to give the same away, which might apply equally well to any number of pamphlets and give no notice of any particular charge, could not be held good on any construction of the section of the statute authorizing a charge in the terms and language of the statute. In *West* v. *People,* 137 Ill. 189, the court said that the purpose of the provision in the bill of rights that one accused of a criminal offense shall have the right to demand the nature and cause of the accusation against him, is to secure to the accused such specific designation of the

offense laid to his charge as to enable him to prepare fully for his defense and plead the judgment in bar of a subsequent prosecution for the same offense, citing a great number of decisions. In *Prichard* v. *People,* 149 Ill. 50, it was said that the rule requiring all allegations of fact in pleadings to be direct and positive is not changed by the section of the Criminal Code providing for charging an offense in the terms and language of the statute. In *Cochran* v. *People,* 175 Ill. 28, it was held that section 6 does not make an indictment sufficient which charges the offense in the language of the statute if the statute so fails to describe the offense that the use of the statutory language will apprise the defendant of the real offense with which he is charged. In *Gunning* v. *People,* 189 Ill. 165, it was said that all necessary facts should be pleaded in an indictment with reasonable certainty, and that section 6 of division 11 of the Criminal Code has not dispensed with that rule. These cases were all decided in view of the constitutional guaranty that an indictment shall notify one accused of crime of the nature and cause of the accusation, and any interpretation of the statutory provision which would infringe upon that right would render the statute unconstitutional and void. Not only must every criminal accusation inform the accused what crime he is alleged to have committed, but it must also state sufficient matter to differentiate that crime from other crimes of the same class, that the accused may know, without doubt or uncertainty, the nature and cause of the accusation against him and be able to plead the judgment against a further prosecution for the same offense. *Bartell* v. *United States,* 227 U. S. 427.

The statement of the courts that a charge must be so specific that the accused may plead a judgment upon it in bar of a subsequent prosecution was based on the practice by which the record in the former case was pleaded as a plea preliminary to the trial. By that practice the plea of *autrefois acquit* or *autrefois convict* being interposed, the

question whether the two indictments were for the same offense could only be determined by an inspection and comparison of the indictments without the aid of extrinsic circumstances. (*Durham* v. *People,* 4 Scam. 172.) The issue on that plea was tried before the plea of not guilty, and while no one was permitted to contradict the record of the former acquittal or conviction, the record, of course, neither established the identity of the party nor the identity of the offense, which had to be proved by parol. When that practice prevailed the indictments were necessarily required to describe the offense so that a comparison of the two would determine whether the evidence under the first indictment would sustain a conviction under the second and settle the sufficiency of the plea as a matter of law, although the identity of the party and of the offense was to be proved by parol. The practice, however, was abolished in this State by the Criminal Code, which provides for a plea of not guilty and dispenses with all other pleas and permits the defense of a former acquittal or conviction to be made under the plea of not guilty. (*Hankins* v. *People,* 106 Ill. 628.) On the trial the person accused and the particular offense may be shown by parol evidence. (*Swalley* v. *People,* 116 Ill. 247.) But the functions of the court and jury were in no manner changed, and the method of bringing the question before the court or determining it preliminary to the trial does not affect substantial rights under the constitution. The changed practice, by which both issues may be tried at the same time, has no influence on the rule that the indictment must notify the defendant of the nature and cause of the accusation against him.

In *Morton* v. *People, supra,* in considering the question whether the words "confidence game" described the mode or means of committing the offense, the court said that the accusation was sufficiently identified by the name of the victim; and that was correct on the question then being considered, where the charge was of obtaining money from

a particular person, but it would be absurd to say that an indictment for larceny sufficiently designates the offense by naming the person from whom property was stolen. If that were true, the grand jury, which alone can make a charge of felony against a defendant, might hear evidence of a larceny from a named person of one species of property and the defendant be put on trial and convicted of stealing other property from the same person of which property the grand jury had never heard and a larceny of which they did not intend to charge. The Supreme Court of Alabama, in considering that question in *Henry* v. *State,* 33 Ala. 389, said that a defendant cannot be said to be informed of the nature and cause of the accusation against him unless the indictment sets forth the facts constituting the offense with such certainty and so fully identifies the offense that the accused and the court may know that the offense for which he is put on trial is the same offense for which he was indicted by the grand jury. The State's attorney does not, and cannot under our constitution, charge any person with a felony but the charge must be made by the grand jury by means of an indictment, and a bill of particulars cannot supply the place of an indictment or render one sufficient that does not meet the constitutional requirement. If such an indictment as this is sufficient, a defendant may be indicted by the grand jury for one offense and tried by the State's attorney for another. To say that a defendant, when indicted, knows what property he is charged with obtaining, whether by larceny, false pretenses or the confidence game, is clearly unsound unless the indictment informs him. Of course, if a defendant is guilty he knows what property he obtained, but the constitutional guaranty is also for the protection of innocent people, that one may be advised by the indictment itself what charge is made against him. The nature and cause of the accusation must be in writing and contained in the indictment, of which the accused has a right to demand a copy; and even if the ac-

cused is guilty and knows what property he obtained, or is not guilty but has found out what evidence will be offered against him, the fact of such knowledge is no answer to an objection to the indictment.

In the case of *People* v. *O'Farrell,* 247 Ill. 44, which was an indictment for embezzlement, the court had declined to require a bill of particulars, and it was held that there was no error because the indictment was specific, and the court cited as authority for the sufficiency of the indictment the three following cases: *Lycan* v. *People,* 107 Ill. 423, in which each count charged the defendant with embezzling money to the amount of $600; *Ker* v. *People,* 110 Ill. 627, in which embezzlement of money, funds and securities was charged and there was no question concerning the description of the same; and *McElroy* v. *People,* 202 Ill. 473, in which there was a charge of embezzlement to the amount of $106.50 and nothing was said about the sufficiency of the description. No case has been found that furnishes any support to a claim that an indictment charging the obtaining of property without any specification of the kind or species would be a sufficient compliance with the bill of rights.

In Missouri there is a statute substantially like ours respecting the confidence game, and indictments similar to this one have been held bad in *State* v. *Crooker,* 95 Mo. 395, and *State* v. *Clay,* 100 id. 571. The legislature of Maine prescribed a form of complaint for a misdemeanor which was declared to be sufficient for all cases. A complaint in the prescribed form was held to violate constitutional rights, and the court said that while the legislature might dispense with matters of form, matters of substance which identify the offense cannot be dispensed with; that for centuries since the declaration of Magna Charta the law has required that no person shall be held to answer until the accusation against him is formally, fully and precisely set forth so that he may be prepared to meet the

exact charge against him. (*State* v. *Learned,* 47 Me. 426.) In a later case an indictment for a felony followed the form established by legislative authority, but it was held that the indictment infringed upon constitutional rights because the form did not meet the requirements of the constitution in identifying the offense. (*State* v. *Mace,* 76 Me. 64.) The legislature of Texas attempted to dispense with material allegations in an indictment, and the act was held void. (*Hewitt* v. *State,* 25 Tex. 722.) This indictment cannot be sustained on the same ground as the indictment in the case of *Cannady* v. *People,* 17 Ill. 158, charging the defendant with selling liquor in a less quantity than one gallon without a legal license to keep a grocery.

Where an act in and of itself constitutes a crime against public law it is sufficient to charge the commission of the act, as in the case of keeping a gaming house or other disorderly house, managing a lottery or permitting the use of premises for that purpose, keeping a dram-shop without a legal license, or committing various other offenses where the act itself constitutes the crime. If the offense consists in selling to a particular class of persons, the name of the person must be given in order that the offense may be identified. It is not necessary to hold that the General Assembly intended by the form prescribed to disregard and violate constitutional rights by providing that an indictment would be sufficient which gives no description of the property obtained and does not distinguish the offense of the defendant from all other offenses of the same general class.

In our opinion the court erred in overruling the motions to quash the indictment and in arrest of judgment, and the judgment ought to be reversed.